FILED

2020 Apr-29  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| AMSTED RAIL COMPANY, INC, et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs/Counter Defendants, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-00629-JEO |
| | ) | |
| CITY OF BESSEMER, ALABAMA, | ) | |
| | ) | |
| Defendant/Counter Claimant. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs/Counter Defendants Amsted Rail Company, Inc. and Griffin Wheel Company, Inc. (collectively "Amsted") bring this breach of contract action against Defendant/Counterclaimant the City of Bessemer ("the City"), alleging that the City has breached its obligation under a Project Agreement requiring it, among other things, to pay tax rebates due and owing Amsted for the 2017 and 2018 tax years. (Doc. 1 ("Compl.")).[1]  Amsted also seeks a declaratory judgment finding the City in breach of the agreement and requiring it to pay the tax rebates due to Amsted through

---

[1] References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files ("CM/ECF") system.  Unless otherwise noted, page citations to briefs, evidence, and other papers in the court file are to the page number of the electronically filed document, which may not coincide with pagination on the original "hard copy."  However, pinpoint citations to all depositions are to the page of the deposition transcript and to all affidavits and/or declarations are to the paragraph of the document.

the 2021 tax year.  (*Id.* at 7-9).  The City filed an answer and counterclaim against Amsted.  (Doc. 11).  The counterclaim seeks a declaration that the Project Agreement is null and void and asks the court to order Amsted to return the tax rebates paid by the City from 2014 through 2016 and declare the City is not obligated to make any tax rebates from 2017 through 2021.  (Doc. 40).

Now before the court[2] are three motions.  The first is Amsted's motion for summary judgment on its claims and on the City's counterclaim.  (Doc. 23).  The second is the City's motion for summary judgment on its counterclaim.  (Doc. 28).  Those motions have been fully briefed, (docs. 24, 29, 35, 42), and are ripe for decision.  The third motion is Amsted's motion to strike.  (Doc. 34).  It too is fully briefed, (docs. 34, 41), and ripe for decision.  The court begins with the motion to strike and then moves to the cross motions for summary judgment.

## I.  MOTION TO STRIKE

"A district court has broad discretion in determining the admissibility of evidence" on a motion for summary judgment.  *Hetherington v. Wal-Mart, Inc.*, 511 F. App'x 909, 911 (11th Cir. 2013).[3]  The nonmoving party is not required to "produce evidence in a form that would be admissible at trial in order to avoid

---

[2] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 20).

[3] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority.  11th Cir. R. 36-2.

summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The Eleventh Circuit has "read this statement as simply allowing otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (citing *Offshore Aviation v. Transcon Lines, Inc*., 831 F.2d 1013, 1017 (11th Cir. 1987)) (emphasis omitted).

Amsted moves to strike two affidavits submitted by the City in support of its motion for summary judgment on its counterclaim and in opposition to Amsted's motion for summary judgment.  (Doc. 34).  Specifically, Amsted moves to strike the affidavits of Forrest Davis[4] and Wanda D. Taylor.[5]  Amsted contends the court should strike Davis's affidavit for the following reasons: (1) "it is chock full of hearsay statements[6] . . . for which no foundation of admissibility has been laid"; (2) there is "no affirmative representation that his affidavit is based on personal knowledge of the subject events"; (3) "the parol evidence rule[] bars the admission of the extrinsic evidence contained within the Davis affidavit and attached documents because the Project Agreement contains a merger clause."  (*Id*. at 3 (footnote omitted)).  As for Taylor's affidavit, Amsted contends it is inadmissible

---

[4] Davis is the Director of Economic and Community Development for the City.

[5] Taylor is the City Clerk.

[6] Amsted does not specifically delineate which statements it contends are hearsay.

because the testimony does not establish that it is based on personal knowledge.  (*Id*. at 4-5).  Amsted specifically points to Taylor's LinkedIn biography which apparently indicates that she was not the City Clerk at the time of the events in question.  (*Id*.).  Amsted also asserts that the affidavit does not verify the steps taken or documents reviewed in verifying the statements made by Taylor.  (*Id*. at 5).

In response, the City supplemented both affidavits with additional affidavits where both Davis and Taylor state that their original affidavits are based on personal knowledge.  (Doc. 41; Doc 41-1 ("Taylor Aff. II") at 1-2; Doc. 41-2 ("Davis Aff. II") at 1).  Additionally, Davis' second affidavit attaches the documents he reviewed and used to prepare his first affidavit.  (Doc. 41 at 3; Davis Aff. II).  As for Taylor, her second affidavit clarifies that she has been continuously employed in the City Clerk's office since April 2002 and one of her job duties throughout her employment has been to place legal notices and legal advertisements in newspapers on behalf of the City.  (Doc. 41; Taylor Aff. II at 2).

Although given the opportunity to do so, (*see* doc. 36), Amsted did not file a reply to the City's response.  The City's response fully alleviates all of the concerns raised by the motion to strike with regard to both affidavits.  While it is true that

some of the statements contained in the Davis affidavit are hearsay, they can all be reduced to an admissible form.[7]  As such, the motion to strike is **DENIED**.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322. The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor

---

[7] As to the parol evidence rule and merger clause, the court addresses those concerns with the substantive issues contained in the motion for summary judgment.

of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment.  *See, e.g., Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005); *Gerling Global Reins. Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001).  "Cross-motions . . . will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. . . ."  *United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted).  "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration."  *Muzzy Prods., Corp. v. Sullivan Indus., Inc*., 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002).

## III.  STATEMENT OF FACTS

Amsted owns a railcar wheel facility located at 2100 Griffin Wheel Drive in the City[8] in a portion of unincorporated Jefferson County, Alabama.  (Doc. 24-3

---

[8] Before March 5, 2013, the facility was located outside the City limits.  (Compl. ¶ 12).

("Project Agreement") at 2).  In June 2010, Amsted approached representatives from the Birmingham Business Alliance, the Alabama Development Office and the Bessemer Economic and Community Development Office, as well as the Bessemer mayor to discuss resuming manufacturing activities with at the facility[9] and the possibility of obtaining a tax abatement of all state and local noneducational property taxes, as well as other taxes.  (Doc. 27-2 ("Davis Aff. I") ¶ 1).  Negotiations between Amsted and the City began in October 2010.[10]  (*Id*. ¶¶ 3-6).

In December 2010, Amsted approached Jefferson County and other entities about resuming manufacturing activities at the facility. (Doc. 24-1 ("Noel Decl.") ¶ 3).  On December 14, 2010, the Jefferson County Commission approved more than $1 million in property tax abatements over 10 years and $848,750.00 in sales and use breaks, in exchange for Amsted's agreement to reopen the facility.  (Compl. ¶ 9; Doc. 40 ("Answer") ¶ 9).

On May 26, 2011, Amsted paid a business license fee of $160 to the City pursuant to Section 22-25 of the City's business license code, which afforded the

---

[9] Before 2010, the facility had been closed for approximately a decade.  (Noel Decl. ¶ 3).

[10] The City seeks to introduce evidence regarding the on-going negotiations between the parties. (*See* Doc. 29 at 5-6; Doc. 41-1 at 2-12).  Not only is this evidence not relevant to the issues before the court, the contract between the City and Amsted contains a merger clause.  Merger clauses create a presumption that the written instrument represents an integrated, final and complete agreement of the parties. *Ex Parte Harbor Home, Inc.,* 798 So. 2d 656, 660 (Ala. 2001).  As such, the court does not consider this evidence as part of its determination on summary judgment.

facility police and fire protection even though it was outside the City limits. (Doc. 27-4 ("Young Aff.") ¶ 1). A few months later, however, in August 2011, the Bessemer City Council repealed Section 22-25, resulting in the facility no longer being eligible for fire and police protection from the City. (Doc. 27-3 ("Taylor Aff.") ¶ 1). As a result, Amsted and the City discussed the possibility of annexing the real property where the facility is located, as well as continuing the negotiations regarding the possibility of ad valorem tax abatements under the Tax Incentive Reform Act of 1992. (Doc. 40 ("Amended Counterclaim") ¶ 14). During these negotiations, the City reminded Amsted, at its request, that the business license fee was $150.00 plus 25 cents per thousand gross receipt from sales at the facility from the preceding year. (Doc. 27-5 at 17-18).

Amsted and the City continued negotiations for some time. By December 2012, however, Amsted had purchased substantially all the personal property for which ad valorem tax abatements were requested from the City and already placed them in service. (*Id*. ¶ 15). As such, the personal property was ineligible for ad valorem tax abatements pursuant to the Tax Incentive Reform Act. (*Id*.). The parties, therefore, switched courses and began to look into an agreement for ad valorem tax rebates.

On February 25, 2013, Amsted and the City entered into the Project Agreement. (Project Agreement at 2-13). The Project Agreement begins with

numerous "Recitals."  (*Id*. at 2).  The second of those recitals states: "WHEREAS, the Company[11] is engaged in the manufacturing of railroad wheels at a facility located at 2100 Griffin Wheel Drive, Bessemer, Alabama, (the 'Project') . . . ."  (*Id*. at 2).  The Project Agreement continues with definitions in Article 1 and then moves on to Article 2 entitled "Certain Incentives."  (*Id*. at 4-5).  In Article 2.1, entitled "Assistance with Permits", the parties agreed as follows:

> In addition to the other assistance set forth herein, the City hereby agrees, with the cooperation of the Company and for so long as the Company, or an Affiliate of the Company, shall own or lease the Project Site and operate the Project, to do all reasonable things and take all reasonable actions allowable under Alabama law necessary to cause the Company to receive expeditious and timely processing or all applications for obtaining and maintaining the permits relating to any improvements to the Project Site and the operation of the Project and timely renewal of all such permits of or with the City.

(*Id*. at 4).  Article 2.3 of the Project Agreement addresses the annual business license cap:

> So long as the Project Site is used in a manner consistent with the Project, the City agrees to classify the Company's activities in the City in connection with the Project under the North America Industry Classification System Section 332710, manufacturer, or any life successor classification, for purposes of business license tax levied by the City's Ordinance No. 3358, as the same may be amended from time to time, and further agrees that the business license purchased by the Company pursuant to such classification cannot exceed $5,500 per license year for the years 2013 through 2018.

---

[11] The Project Agreement refers to Amsted Rail Company, Inc. and Griffin Wheel Company, Inc. collectively as "the Company."  (Project Agreement at 2).

(*Id*.).  Article 2.4 details the City ad valorem tax rebate:

> Pursuant to the provisions of Amendment No. 772 to the Constitution of the State of Alabama (1901), the City hereby agrees to provide the Company the benefit of the following tax incentive: a rebate of non-educational City real property and personal property ad valorem taxes on the Project Site and other real property improvements located on the Project Site, and any other real or personal property purchased in connection with, incorporated into, and used in the operation of the Project which was placed in service prior to December 31, 2012, through the tax year ending on September 30, 2021.

(*Id*.).  In Article 3, entitled "Representations and Covenants," Section 3.2 addresses the representations, covenants and warranties from Amsted:

> The Company represents, covenants and warrants to the City that it will exert its best efforts to employ no less than an average of 100 employees at the Project Site during its first two years of operation . . . , such average to be calculated by taking the sum of the total number of employees working at the Project Site on the last day of each month in the first year of operation divided by twelve (12).

(*Id*. at 5).

On March 5, 2013, the Bessemer City Council held a public hearing on the Project Development.  (Taylor Aff. ¶ 3).  That same day the City Council passed a resolution authorizing the Mayor to execute the Project Agreement with Amsted and passed an ordinance annexing the Project Site into the City.  (*Id*. ¶¶ 4-5).

The first few years of the Project appeared to run smoothly.  As promised under the Project Agreement, Amsted employed more than 100 employees on average during the first two years.  (Noel Decl. ¶ 6). Additionally, the City paid the rebates due under the Project Agreement for the tax years ending in 2013 through

2016.  (Answer ¶ 23).  Specifically, for the tax years ending in 2014 through 2016, Amsted paid personal property taxes to the City in the amount of $1,273,811.44. (Noel Decl. ¶¶ 14-16).  The City paid rebates under the Project Agreement for those same years in the amount of $484,815.73.  (Noel Decl. ¶¶ 14-16; Doc. 19 ¶ 26).

The problems between the parties began in the middle of 2016.  On June 1, 2016, Amsted mailed notice to the City's mayor that they were temporarily laying off 155 employees effective August 1, 2016.  (Doc. 27-5 at 10).  That same day, Amsted issued a press release that they were temporarily idling the facility in the City before the end of September 2016.  (*Id*. at 9).  Amsted's 2016, 2017 and 2018 Annual Reports confirmed that Amsted idled the Bessemer, Alabama facility in July 2016.  (*Id*. at 11-13).

As a result of the idling of the facility, the last year Amsted received an ad valorem tax abatement from Jefferson County was for the 2017 tax year.  (Doc. 19 ¶ 38).  The ad valorem tax abatement, authorized by the Alabama Tax Incentive Act of 1992, states that the maximum exemption period is limited to "[t]he period ending on the date on which the property has ceased, for 6 consecutive months, to be used in the active conduct of an industrial or research enterprise."  Ala. Code § 40-9B-3(a)(12)(b).

11

Sometime in the first part of 2018, as part of an audit, the City discovered that Amsted failed to purchase business licenses for 2014 through 2017.[12]  (Young Aff. ¶ 13).  Section 6 of the City's business code requires all businesses to purchase a license before conducting business.  (*Id.* ¶ 3).  The City required Amsted to pay $5,500[13] plus penalties and interest for each year in question.  (*Id.* ¶ 13).  Amsted did not contest the audit and paid the amounts in full on May 16, 2018.  (*Id.*; Doc. 35-1 ("Fabac Decl.") ¶ 5).

In June 2018, Amsted requested payment of the rebate under the Project Agreement for the tax year ending in 2017.  (Compl. ¶ 26; Answer ¶ 26).  Amsted paid personal property taxes of $439,552.42 for the 2017 tax year, which would have resulted in a rebate of $161,461.07 under the Project Agreement.  (Noel Decl. ¶ 14). The City, however, refused to pay Amsted the rebate for the 2017 tax year.  (Answer ¶ 27).  Similarly, Amsted paid personal property taxes of $497,477.17 for the tax year 2018, which would have resulted in a rebate of $149,883.75 under the Project

---

[12] Although Amsted paid for a business license in 2013, it paid only $150.00, plus a $12.00 issue fee and $1.11 in penalties.  (Young Aff. ¶ 2).  The City maintains that Amsted underpaid its 2013 business license fee by $2,396.69, plus interest and penalties because the fee also includes 25 cents per thousand of gross receipts from sales for the preceding year.  (Doc. 29 at 11).  Amsted's gross receipts for 2012 were $9,586,770.00.  (Doc. 27-5 at 22).

[13] The business license fee was capped under the Project Agreement at $5,500.  (Project Agreement at 4).

Agreement.  (Noel Decl. ¶ 18).  The City again refused to pay Amsted the rebate for the 2018 tax year.[14] (Answer ¶ 30).

The City contends that, like the tax abatements from Jefferson County, once the facility was idled, the City was not required to pay the tax rebates to Amsted under the Project Agreement.  (Compl. ¶ 32; Answer ¶ 32).  Amsted maintains, however, that no such requirement exists in the Project Agreement.  (Doc. 24 at 10). Regardless, Amsted asserts that the facility remains operational, but admits that it has not been engaged in commercial wheelcar production.  (Noel Decl. ¶ 8-12). Instead, Amsted continues to exercise the equipment at the facility and uses the facility for industrial and research enterprises.  (*Id*.).  Amsted also maintains all applicable environmental permits for the facility.  (*Id*. ¶ 13).

## IV.  DISCUSSION

Amsted contends they are entitled to summary judgment on the claims in the complaint because they complied with the obligations under the Project Agreement with regard to tax rebates by employing an average of more than 100 employees for the first two years of the project, but the City failed to provide the tax rebates for the duration of the contract.  (Doc. 24 at 11-17).  Additionally, Amsted contends that the City's counterclaims are due to be dismissed because (1) the City is equitably

---

[14] At the time the summary judgment motion brief was filed, Amsted contended that it would remit taxes in December 2019 in the amount of $65,118.08, entitling them to a rebate of $80,903.49 from the City for the tax year ending 2019. (Noel Decl. ¶ 19).  The court assumes this occurred.  The court also notes that the taxes were reduced from earlier years based on a revised tax assessment Amsted received from Jefferson County.  (*Id*.).

estopped from claiming that the Project Agreement is void; (2) the Project Agreement does not require Amsted to continually operate the facility to receive tax rebates; and (3) the Tax Incentive Reform Act of 1992 does not apply to the Project Agreement. (*Id*. at 17-26).

The City argues that Amsted is not entitled to summary judgment with regard to their claims for breach of contract and declaratory judgment because Amsted repeatedly breached the Project Agreement by (1) failing to purchase a business license and (2) failing to engage in manufacturing of railroad wheels at the facility. (Doc. 29 at 21-24).   Additionally, the City contends it is entitled to summary judgment on its counterclaim and argues that the Project Agreement is void because the City failed to follow the legal requirements of Amendment 772 of the Alabama Constitution. (*Id*. at 17-18, 24).  The City argues equitable estoppel does not apply and, even if it did, Amsted could not take advantage of it because Amsted has "unclean hands." (*Id*. 19-20).

The court first addresses the City's counterclaim – that the contract is null and void – because if the court so finds, there is no need to address any of the other issues before it.  However, because the court finds that the contract is not void, the court then moves on to the breach of contract claim asserted by Amsted in its complaint. For the following reasons, the court concludes the City breached the contract when it failed to pay Amsted the rebates.

**A.  The Project Agreement is not void.**

The City's counterclaim seeks a declaration that the Project Agreement is null and void and asks the court to order Amsted to return the tax rebates paid by the City from 2014 through 2016 and declare the City is not obligated to make any tax rebates from 2017 through 2021.  (Doc. 40).  The City contends the Project Agreement is void because it did not follow two provisions of Amendment Number 772 to the Alabama Constitution.[15]  (*Id*. at 17-18).  Amendment 772 requires the following before a governing body of any municipality lends its credit or grants aid to any corporation for the purpose of promoting the economic and industrial development of the municipality:

> (1) The action proposed to be taken by the county or municipality is approved at a public meeting of the governing body of the county or municipality . . . by a resolution containing a determination by the governing body that the expenditure of public funds for the purpose specified will serve a valid and specific benefit accruing to any private entity or entities.
>
> (2) At least seven days prior to the public meeting, a notice is published in the newspaper having the largest circulation in the county or municipality . . . describing in reasonable detail the action proposed to be taken, a description of the public benefits sought to be achieved by the action, and identifying each individual, firm, corporation, or other business entity to whom or for whom benefit the county or municipality proposes to lend its credit or grant public funds or things of value.

Ala. Const. Art. 4 § 94.01(c)(1).

---

[15]  Section 2.4 of the Project Agreement specifies that the tax rebates are authorized pursuant to the provisions of Amendment 772.  (Project Agreement at 4).

The City contends that neither requirement was met.  Initially, the City argues that the first requirement was not met because the parties executed the Project Agreement on February 25, 2013, before the City Council adopted a resolution at a public meeting authorizing the mayor to do so.  (Doc. 29 at 17-18).  The City Council did not meet until March 5, 2013, but when it did, the Council passed a resolution authorizing the Mayor to execute the Project Agreement with Amsted. (Taylor Aff. ¶¶ 4-5).  With regard to the second requirement, it is undisputed that the required legal notice was not published.[16]  (Taylor Aff. I. ¶ 2).  Based on the failure to follow these two legal requirements, the City concludes the Agreement is void.  Amsted, however, argues that the City is estopped from arguing that the contract is void. (Doc. 35 at 4-9).  The court agrees.

Equitable estoppel is "based upon the ground of public policy and good faith, and is interposed to prevent injustice and to guard against fraud by denying to a person the right to repudiate his acts, admissions, or representations, when they have been relied on by persons to whom they were directed and whose conduct they were intended to and did influence."  *Mazer v. Jackson Ins. Agency*, 340 So. 2d 770, 772 (Ala. 1976) (emphasis, internal quotation marks and citations omitted).  "The purpose of [the doctrine of] equitable estoppel . . . is to promote equity and justice

---

[16] The court notes that this fact was not always undisputed.  The court permitted, over Amsted's objection, the City to amend its counterclaim to assert this now undisputed fact.  (*See* Doc. 39).

in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience."  *Id.* (alteration in original) (citation omitted).  As such, equitable estoppel has three necessary requirements:

> The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. The other relies upon that communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

*Id.* (quoting Dobbs, Remedies § 2.3 (1973)).

"'[A]lthough the doctrine of estoppel is rarely applied against a municipal corporation, it may be applied in a proper case when justice and fair play demand it and where there has been a misrepresentation or concealment of material fact.'" *Town of Boligee v. Greene County Water & Sewer Auth.,* 77 So. 3d 1166, 1172-73 (Ala. 2011) (quoting *Peterson v. City of Abbeville*, 1 So. 3d 38, 44 (Ala. 2008)) (quoting *City of Foley v. McLeod,* 709 So. 2d 471, 474 (Ala. 1998)). The application of the doctrine to governmental entities is in accord with the principle that "[t]he state, in all its contracts and dealings with individuals, must be adjudged and abide by the rules which govern in determining the rights of private citizens contracting and dealing with each other." *Talladega City Bd. of Educ. v. Yancy*, 682 So. 2d 33, 37 (Ala. 1996) (internal quotation marks and citation omitted).

17

The Alabama Supreme Court has identified only two instances when the doctrine of equitable estoppel cannot be applied against a municipality. The first is one in which the municipality "question[s] the legality of a contract into which it had no authority to enter." *Alford v. City of Gadsden*, 349 So. 2d 1132, 1135 (Ala. 1977). The other is one in which the municipality seeks to avoid doing "that which it has no authority to do." *Id.*; *see also City of Guntersville v. Alred*, 495 So. 2d 566, 568 (Ala. 1986). In both cases, the doctrine does not apply because of "the absence of general authority in the municipality to do that which would result from the application of the doctrine." *Talladega City Bd. of Educ.*, 682 So. 2d at 37. Therefore, where a municipality "has the authority to enter a particular contract, 'a city can be estopped to deny a contract [— even one] into which it did not legally enter.'" *Id.* (quoting *City of Guntersville,* 495 So. 2d at 568) (emphasis omitted and alteration in original).

As discussed above, the City contends there are two missing elements to the establishment of an enforceable contract between it and Amsted. And yet, it is clear that the City had the authority to enter into the Project Agreement with Amsted. Amendment 772 grants the City the authority to lends its credit or grants aid to any corporation for the purpose of promoting the economic and industrial development of the municipality. Therefore, the court must determine whether the elements of the doctrine of equitable estoppel are satisfied by the particular facts presented.

Here, the court concludes that equitable estoppel applies.[17]  The undisputed evidence shows that the City's conduct misrepresented a material fact that induced reliance on the part of Amsted.  Namely, the City knew or should have known that it did not follow the requirements of Amendment 772, but operated under the Project Agreement for over five years, including annexing the property into the City, accepting more than $1.5 million in property taxes and paying close to $500,000 in rebates to Amsted.  "[C]ontinued acquiescence" to certain activity can "amount[] to a misrepresentation of a material fact." *City of Foley*, 709 So. 2d at 474.  Amsted reasonably relied on these actions when it employed more than 100 people for two years per the Project Agreement and invested more than $48 million in capital improvements to the facility.  Under these circumstances, the court finds that the City is equitably estopped from denying the validity of the Project Agreement.

The court disagrees with the City that *Town of Boligee v. Greene County Water and Sewer Authority* supports its argument that there was no misrepresentation of material fact.  In that case, the county water authority presented a proposal to the town council that would have allowed the water authority to run a pipeline through Boligee to provide water for the citizens of the town.  77 So. 3d at

---

[17] The court recognizes the City's assertion that the issue of equitable estoppel is a question for the jury because it "is generally a mixed question of law and fact."  (Doc. 42 at 2) (quoting *City of Guntersville v. Alred*, 495 So. 2d 566, 568 (Ala. 1986)).  Here, however, all the facts that apply to the issue of equitable estoppel are undisputed.  As such, it is proper for the court to decide the issue on summary judgment.

1167.  After much negotiation and multiple town meetings on the subject (during which the authority was present), the council ultimately decided not to enter into the agreement with the authority.  *Id*. at 1167-68.  Despite this decision, the mayor later signed a written agreement permitting the authority to construct and maintain a pipeline inside the town limits but for the purpose of providing water to customers living outside of town.  *Id*. at 1168.  After the authority began constructing the pipeline in the city, the town filed a lawsuit seeking a judgment declaring the action unlawful because they were undertaken without first obtaining the council's permission.  *Id*. at 1167.

The trial court issued a judgment declaring that the mayor had the authority to bind Boligee to the agreement, but the Alabama Supreme Court reversed.  *Id*. at 1170-73.  The Court found that the mayor did not have the authority to enter into the agreement without the authorization of the town council.  *Id*. at 1172.  The Court also concluded that the doctrine of equitable estoppel did not apply.  *Id*. at 1173. The Court reasoned:

> There is no evidence in the record indicating that members of the governing body of Boligee misrepresented or concealed any material fact. Rather, the evidence established that Boligee, through its attorney, communicated its concerns regarding the lack of the town council's approval but that the project engineer and the Authority concluded that the approval of the town council was not required for the project.

*Id*.

The *Town of Boligee* case is distinguishable from the facts presented here for the simple reason that the authority had knowledge that their actions were in contravention of the law. In particular, the authority knew that any agreement must be approved by the council based on its past dealings with the council. In fact, the authority had been to council meetings for over two months in an attempt to negotiate a different contract with the town to run pipeline through the city limits that ultimately failed. The authority knew that the town council had not approved the new agreement to run pipeline within the town limits for customers outside the town's limits. And yet the authority went ahead, entered into an agreement with the mayor that had not been approved by the council, and acted upon that agreement, despite the concerns regarding the lack of council approval that were communicated to the authority. Nothing about these facts indicates a misrepresentation on the part of the town council or reasonable reliance by the authority.

The facts here are more akin to those present in *Talladega Board of Education v. Yancy*. In that case, Yancy, a certified teacher, sued the Talladega Board of Education after he was terminated, and alleged that his termination was contrary to the Teacher Tenure Act. 682 So. 2d at 35. The Board contended Yancy did not have a valid claim for wrongful termination because there were two unfulfilled conditions precedent to the establishment of an enforceable employment contract between it and Yancy. *Id.* at 35, 37. Those two conditions were that the superintendent had

not made a written recommendation to the Board to employ Yancy and there had been no "affirmative action on the nomination by the Board." *Id*. at 35.

After a non-jury trial, the trial court agreed with Yancy, specifically citing to the doctrine of equitable estoppel, and the Alabama Supreme Court affirmed. *Id*. at 35-38.  The Alabama Supreme Court first found that the Board clearly had the statutory authority to hire Yancy.  *Id*. at 37. As such, if the elements of equitable estoppel were satisfied, the two missing requirements would not preclude its application. *Id*. at 37-38.  The Court then found those elements present by the facts. *Id*. at 38. Specifically, the Court found that the actions of the superintendent constituted conduct that concealed a material fact and that was calculated to induce Yancy to change his position in reliance on the facts as he mistakenly thought them to be, and that Yancy did in fact change his position to his detriment.  *Id*.  The Court pointed to the silence on the part of the superintendent and Board members when Yancy was introduced as the new drivers' ed teacher and coach, which the Court "characterized as acquiescence or ratification."  *Id*.  The Court also highlighted statements from the superintendent that the Court described as "reinforc[ing] the reasonable inference Yancy could have already drawn - that [the superintendent] had satisfied all the formalities for which he was responsible."  *Id*.  Based on this evidence, the Court concluded "that while the Board was leading Yancy to think all

formalities had been complied with, the Board, and (as between these parties) only the Board, knew that the formalities had not been complied with." *Id*.

The same is true with the undisputed facts before the court in this case. The City's actions led Amsted into the belief that all the formalities required by the City to enter into the contract had been performed in accordance with Amendment 772. The City annexed the property into the city limits, accepted over 1.5 million dollars in taxes, and rebated over half a million dollars to Amsted. Indeed, the evidence establishes that the City itself believed that every formality had been followed, but after the litigation ensued discovered that two prerequisites had not been met. This is precisely the case presented by the Board in *Yancy* and rejected by the Alabama Supreme Court.

In an effort to avoid the consequences of estoppel, the City contends that Amsted has "unclean hands," and, as such, the court should not apply the doctrine because "he who comes into equity must do so with clean hands." (Doc. 29 at 16, 19-20; Doc. 42 at 3-5). More specifically, the City argues that "Amsted *intentionally* breached the [Project] Agreement" when Amsted underpaid business licenses in one year and completely failed to pay for a business license in other years. (Doc. 29 at 19-20 (italics added)). The City further states, "it was not until May 16, 2018, when Amsted was audited by Bessemer that they paid the license fees in question." (*Id*. at 20). Therefore, the City concludes that because Amsted has "unclean hands," they

cannot argue that the City is equitable estopped from denying the validity of the Project Agreement.  (*Id*.).

In response to this argument, Amsted admits that they underpaid and failed to pay for its city business licenses, as alleged by the City.  (Doc. 35 at 9).  However, Amsted maintains that there is no evidence of any intentional conduct and insists the failure was an honest mistake.  (*Id*.).  Amsted notes that as soon as the mistake was discovered by the City and communicated to Amsted, Amsted paid all outstanding fees, including penalties and interest, in full.  (Fabac Decl. ¶¶ 4-5).

The court agrees with Amsted.  There is simply no evidence to indicate any sort of intentional misconduct on the part of Amsted.  Instead, the evidence shows that the failure to pay for the business licenses amounted to negligence on the part of Amsted.  As explained by the Controller for Amsted Rail Company, Inc., the business license fees for the facility are processed at an office in Kansas.  (Fabac Decl. ¶ 4).  "Due to a clerical error, employees in the [Kansas] office did not realize there were two, separate licenses (both City and County) and therefore only paid one (the County) for four years."  (*Id*.).  Although Amsted admits the City sent an invoice for the license fee for the first year and Amsted paid it in full, Amsted apparently did not receive another invoice until December 2017, which it paid in full in January 2018.  (*Id*.).  Then, in March 2018, Amsted received a letter regarding the review of

the business license ordinance by the City and Amsted's delinquency and paid the fees in full, plus penalties and interest. (*Id*. ¶¶ 4-5).

The City responds by stating that it could not have been an oversight or an honest mistake because after a business submits its business license application, as Amsted did in 2013, the business is placed on an "Active Business Account" list and a renewal notice is mailed to those businesses every year. (Doc. 42-2 ("Young Aff. II") ¶¶ 1-2). As such, the City contends that "Amsted failed to pay the business license fees due each year with full knowledge that one was due for each and every year." (Doc. 42 at 4). The court disagrees with the City's interpretation of the evidence before it. Even assuming a renewal notice was issued each year and Amsted received that notice each year, there is still no evidence of intentional disregard.[18] The mere fact that the fees were not paid does not show intent. Instead,

---

[18] Other courts in discussing the "unclean hands" doctrine have stated:

> The "unclean-hands "doctrine contemplates that the party against whom it is asserted has been guilty of 'morally reprehensible, willful misconduct,' *Retail Developers of Alabama, LLC  v. East Gadsden Golf Club*, 985 So. 2d 924, 932 (Ala.2007), or fraudulent purpose, *see Le Furgey v. Beck*, 244 Ala. 281, 284, 13 So. 2d 179, 182 (1943)."

*Hall v. North Montgomery Materials, LLC*, 39 So. 3d 159, 179-80 (Ala. Civ. App. 2008).

> "To succeed on its affirmative defense of unclean hands, [one party] must demonstrate that 'the doors of a court of equity' should be closed to [another party] because it is 'tainted with inequitableness or bad faith relative to the matter in which [it] seeks relief, however improper may have been the behavior of [the first party]." *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery*, 324 U.S. 806, 814–15, 65 S. Ct. 993, 89 L. Ed. 1381 (1945) (bracketed alterations supplied).

Amsted offered an explanation for its failure to pay -- that employees mistakenly believed there was only one business license that needed to be purchased instead of two. The City did not produce any evidence to contradict this explanation. Additionally, the City completely ignores the important fact that Amsted paid all the fees once the City confronted Amsted about the delinquency.[19]  Based on all of this evidence, the court concludes that Amsted is not precluded from arguing equitable estoppel by the doctrine of "unclean hands."

### B.  The City breached the contract.

To establish a claim for breach of contract under Alabama law, a plaintiff must show: "(1) the existence of a valid contract binding the parties in the action; (2) his own performance under the contract; (3) the defendant's nonperformance; and (4) damages." *City of Gadsden v. Harbin*, 148 So. 3d 690, 696 (Ala. 2013) (quoting *Ex Parte Alfa Mut. Ins. Co.*, 799 So. 2d 957, 962 (Ala. 2001)).  The first and last elements are not disputed.  It is the second and third elements where the parties split

---

*Abbott Point of Care, Inc. v. Epocal*, 868 F. Supp. 2d 1310, 1216 (N.D. Ala. 2012) (S.J. Smith).

"'[T]he doctrine of unclean hands cannot be applied in the context of nebulous speculation or vague generalities; but rather it finds expression in specific acts of willful misconduct which is morally reprehensible as to known facts." *Sterling Oil of Oklahoma, Inc. v. Pack*, 291 Ala. 727, 746, 287 So. 2d 847, 864 (1973) (citing *Weaver v. Pool*, 249 Ala. 644, 32 So. 2d 765 (1947))."

*Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc*., 985 So. 2d 924, 932 (Ala. 2007).

[19] The court also notes that the payment remedying the delinquency was made before Amsted requested the rebate and the City first refused.

ways.  As discussed above, Amsted contends the City breached the Project Agreement when it refused to pay the rebates for the tax years ending in 2017 and 2018.[20]  (Doc. 24 at 11-17; Doc. 35 at 9-12).  The City contends, however, that it did not have to pay the rebates under the Project Agreement after Amsted idled the facility.  (Doc. 29 at 21-22; Doc. 42 at 9-10).  For the reasons that follow, the court concludes that the City breached the Project Agreement.

Traditional contract-interpretation principles make contract interpretation a question of law, decided by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent.  *Moore v. Pa. Castle Energy Corp.*, 89 F.3d 791, 795–96 (11th Cir. 1996).  In Alabama,

> General contract law requires a court to enforce an unambiguous, lawful contract, as it is written.  *P & S Business, Inc. v. South Central Bell Telephone Co*., 466 So. 2d 928, 931 (Ala. 1985). *See also McDonald v. U.S. Die Casting & Development Co.*, 541 So. 2d 1064 (Ala. 1989). A court may not make a new contract for the parties or rewrite their contract under the guise of construing it. *Estes v. Monk*, 464 So. 2d 103 (Ala. Civ. App. 1985). . . . When interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state. *Pacific Enterprises Oil Co. (USA) v. Howell Petroleum Corp*., 614 So. 2d 409 (Ala. 1993).

*Dawkins v. Walker*, 794 So. 2d 333, 339 (Ala. 2001) (quoting *Ex parte Dan Tucker Auto Sales, Inc*., 718 So. 2d 33, 35-36) (Ala. 1998).  Extrinsic evidence of the parties'

---

[20] As explained earlier, the court assumes the City refused to pay the rebate on the taxes remitted in 2019 as well.

subjective understanding is not relevant unless the contract is ambiguous. *Moore*, 89 F.3d at 796. The court, therefore, begins with the contract.

Article 2.4 of the Project Agreement addresses the issue of tax rebates. That provision states that the City agrees to provide Amsted with "a rebate of . . . ad valorem taxes on the Project Site and other real property located on the Project Site, and any other . . . property purchased in connection with, incorporated into, and used in the operation of the Project which was placed in service prior to December 31, 2012, through the tax year ending on September 30, 2021." (Project Agreement at 4). This provision does not include a condition that the facility be operating for Amsted to receive the rebates. Instead, the plain language simply evidences an agreement by the City to provide tax rebates through the tax year ending on September 30, 2021.[21] There is no language in Article 2.4 (or any other provision in the contract) conditioning this rebate on any action by Amsted.

This conclusion is reinforced by the other language of the Project Agreement. For example, Articles 2.1 and 2.3 both expressly include language that requires continued operation of "the Project" before the City aided Amsted with permits and capped the business license fees at $5,500 per year. (Project Agreement at 4). The

---

[21] Amsted's obligation under the contract was to employ no less than an average of 100 employees at the Project Site during the first two years of operation. (Project Agreement at 5). It is undisputed Amsted employed more than 100 people during the required timeframe. (Noel Decl. ¶ 6).

term "Project" refers to "the Company is engaged in the manufacture of railroad wheels at a facility located at 2100 Griffin Wheel Drive, Bessemer, Alabama." (*Id.* at 2). Article 2.1 states the City will expeditiously and timely process permits relating to the Project "for so long as the Company, or an Affiliate of the Company, shall . . . operate the Project." (*Id.*). Likewise, Article 2.3 states the City will cap the business license fee for the years 2013 through 2018 "[s]o long as the Project Site is used in a manner consistent with the Project." (*Id.*).

In Alabama, "the legal maxim *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) is frequently applied to aid courts in interpreting statutory language." *Pub. Bldg. Auth. of City of Huntsville v. St. Paul Fire & Marine Ins. Co.*, 80 So. 3d 171, 181 (Ala. 2010). Applying that legal principle here leads to the logical conclusion that continued operation of the Project is not a requirement or condition in Article 2.4. In other words, the specific inclusion of the requirement that Amsted continue to operate the Project in both Articles 2.1 and 2.3, but not in Article 2.4, necessarily results in a determination the that the parties could have included such a condition in Article 2.4, but did not.

Interpreting the Project Agreement as such does not provide "disharmony" as suggested by the City. (Doc. 29 at 21-22). While the City can argue "[i]t does not make sense" that it would agree to assisting Amsted with permits and capping their business license fees in exchange for continued operation of the Project, but not

require the same as it relates to the rebate, (*id*.), the court is not charged with deciding what "makes sense" in the eyes of the City.  The lack of such a requirement makes perfect sense from the standpoint of Amsted, considering the facts presented here. Regardless, the court looks no further than the unambiguous language of the Project Agreement.

Because the language in the contract is unambiguous, the court refuses to consider the extrinsic evidence regarding the formation of the contract, as urged by the City.  While the court certainly understands that the parties may have intended the Project Agreement as a "get around" the provision of Alabama Code § 40-9B-1, (*see* doc. 29 at 21), the Project Agreement speaks for itself.  The language agreed to by both Amsted and the City simply does not condition the rebates on the continued operation of the facility.

In summary, the court concludes that City is equitably estopped from arguing that the Project Agreement is void based on its failure to following the requirements of Amendment 772.  The court also concludes that the City breached the Project Agreement when it failed to pay the rebates in 2017 and 2018 (and presumably in 2019).

## V.  CONCLUSION

Based on the foregoing, Amsted's motion to strike (doc. 34) is due to be denied.  Amsted's motion for summary judgment (doc. 23), however, is due to be

granted in full and the City's motion for summary judgment (doc. 28) is due to be denied in full.  An order consistent with these findings will be entered separately.

**DATED** this 29th day of April, 2020.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge